All right, we call our third and last case of the day. Which is Transcontinental Gas Pipeline versus Gail Brandon-Cochran and many others. Thank you, Your Honor. My name is Donald Evans. I appear on behalf of the appellants together with Sarah Martin, Steve Mischerhausen, Billy Neal, and Harry Camp. We appreciate the grant of oral argument on this important matter of first impression in this circuit. It is an honor to appear in your court. It is an honor to represent the 22 landowners with property stretching across northwest Georgia from Coweta County to Whitfield County. It's also an honor to be selected from among a team of highly experienced lawyers to be presenting the argument on behalf of the group. The landowners that we represent have witnessed the construction of a natural gas pipeline across their yards, their farms, and forests. All pursuant to an injunctive easement created by the district court under Federal Rule of Civil Procedure 65. And all without payment of a single dime in compensation. And without giving the landowners any opportunity to present evidence or to contest the claims made by Transco in its initial pleadings. Let me start again as I did last time with a practical question before we get into the nuts and bolts of your argument. My understanding is the pipeline has now been installed, that it's there. And my question to you is if we did reverse the preliminary injunction, what remedy are you going to have other than the compensation you would have otherwise for the taking of the property? Aren't we still going to someday be in a hearing where compensation is going to be decided? Are you saying they better rip the pipe out? What is your position? Your Honor, we are asking the court to reverse the district court and to prevent any further use by Transco of our client's property until such time as they have properly acquired rights thereto under the NGA and paid for them. The pipeline is largely installed, but there's really… Are you going to ask them to rip it out should you win? No, Your Honor. That would certainly be impractical. But there are two distinct takings in this case, which arise from two different sources. We haven't gotten to the second one yet. That will be done one day under the NGA. That's when title transfers under preexisting law outside of this context. That's normally when possession transfers with the title. Here, of course, we are still living through the taking which has preceded the formal taking under the NGA. Of course, it is this taking that our appeal is aimed at. We feel the district court erred when it exercised its inherent authority to create this taking, allow this injunctive easement, allow Transco to take and use our client's property rather than explicit congressional authority for that taking. We contend that the district court erred in creating a substantive property right that doesn't exist under Georgia law. So if you won and we stopped right now and said we don't think the preliminary injunction should have been granted, stopped installing the pipe, then you're saying we would go back for what purpose to the district court? We would go back to the district court to enjoin any further use of the facilities that have been permanently installed on our client's properties until such time as they have acquired title to them and paid for them. The district court's error in allowing this prejudgment access has created a property right that they are now exercising that has no precedence under Georgia law. Is the gas actually flowing through the pipeline? I heard that, Your Honor. I do not know for sure. But none of the cases that have been brought against landowners pursuant to the NGA, I'm not aware of any of them reaching conclusion, i.e. a transfer of title based upon compensation being determined and paid. That has not occurred. So the issue is still alive and our clients are still living through it. Transco still has the right to come and go across their properties and they have not paid a dime for that privilege. Your complaint is not just that they used a security bond versus putting cash in. You want outright your clients to be paid before they're allowed to do any of this. Exactly. You're not quibbling and saying, oh, they should have put the cash up instead of a bond. That's not your argument. It is among our arguments, Your Honor, to acquire private property and use it without paying for it violates state constitution. And to acquire it without a plan for how it will be compensated violates the Fifth Amendment. Of course, that gets right into the heart of the complexity of this and all the rules and statutes. And don't get me wrong. I think any of us would be highly incensed when we're on some land and all of a sudden the federal government or one of their folks comes there and says, hey, it's mine. Here's my tractor. Nobody would be happy with that. And under state law, it sounds like you'd be pretty well protected that they'd have to pay you first. The problem, I think, for you is that we go through the statute, and the statute then funnels us to Rule 71.1. And 71.1 says you have to have a deposit with the court, but then we have our own natural gas decision, which says that that rule controls. And then when you go to the law that probably really is going to control the payment, you get to the general injunction statute, which just requires assurity. So it's circular, but it's problematic. If you could walk me through those statutes in a way that gets you money first, then I'd like to hear your argument. Thank you, Your Honor. The standard analysis that has been given to this issue by so many courts that the court noted starts from 71.1 and how that overruled the conformity rule that existed under the NGA. It's conformity and self-practice. And then, of course, the federal rules of civil procedure are there, and they exist. And the court has equitable power to create an equitable remedy where it sees irreparable harm that wouldn't otherwise be able to be repaired. However, just because that right is there doesn't make it appropriate to use it in the context of eminent domain. The eminent domain statutes are strictly construed. Where Congress acts to allow a private actor to use the sovereign power of eminent domain, they may only use it in accordance with the rules that Congress has set up about how, when, and where it may be used and by whom it may be used. And nothing can be added to that congressional authority by a court. We contend that using Federal Rule 65 in this context, in the context of eminent domain, is essentially a judicially created right of eminent domain that is inappropriate under the circumstances. It would also be inappropriate, for example, Your Honor, if the court had ruled that pending, you know, during the construction, not only would a transfer get immediate access, but during construction, they have the right to remove all the landowners from the property and imprison them. That would be wrong. The court would have equitable power, certainly, to do these things, but they're wrong for a different reason. Same with using Rule 65 in the context of eminent domain. Particularly where, if you consider from the landowner's perspective, Judge Ross's order does nothing to spell out how long it's going to last, how many people can come, what type of equipment they can use, how many hours a day can they work, can they work all night. It makes no provisions for religious holidays. Can they work on Christmas? We don't have a basis for answering any of these questions that our landowners have because it's an equitable right. It is not a property right that is defined and has a body of law surrounding it under Georgia law, like an easement, for example. This is not an easement. It's not a permanent easement. That's what you get at the end of the process. Is it a temporary easement? No, ma'am, because you can't install permanent equipment when exercising a permanent easement. Is it a license? No, you can't cut trees, remove them from the property, sell them, and keep the money in the exercise of a mere license. Well, I go back to Judge Karn's question that she opened with. What would the remedy look like that you're seeking? The remedy would be for Transco to cease their use of our client's property until they have paid for it. And would that include waiting for the entire compensation proceeding to play out? Certainly that we would, yes, we would accept. Under the circumstances, we would be thankful for a prepayment, any payment, pending a final resolution. That would allow Transco basically to exercise rights like they would have had under the Declaration of Taking Act, which the United States is required to use. In the United States, the sovereign is required to make a deposit. Transco, on the other hand, in the circumstance of this case, is not. We contend that violates both federal and state law and should be overturned by this court. I see my time is just about over. We wanted to reserve a moment to rebut. Thank you, Your Honor. Good morning. May it please the Court. Clay Massey with Olson & Byrd for Transcontinental Gas Pipeline, the Appalachee. Judge Carnes, Judge Conway, I want to address one of the questions you asked Mr. Evans, is what's the status of the pipeline? The pipeline is installed and in service. We have a FERC letter dated July 26, 2016 of this summer, certifying or confirming that we installed the pipeline in compliance with the certification it issued and that we are authorized to begin service and we have done that. So I just wanted to clarify that in response to your inquiries earlier. The remedy is provided for the appellants, and that is to get compensated through the proceedings. That's all that's left to go. That's all that's left, and we're trying to do that. Judge Ross Below has set an October 26th status conference. We're trying to move toward getting paid. There are some landowners who did not appeal and who are down there. Judge Ross is trying to make an effort to make sure that all of this, obviously subject to what's pending on appeal, moves forward so that they are getting paid. That is the remedy. There's a procedure for that. There's a proceeding and there are rules that apply to that, and that is their remedy, to get paid. Beyond getting paid, I'm sympathetic to your opposing counsel's argument. It must be pretty vexing to have paid for property and be there. Christmas Day, Thanksgiving Sunday, whatever, and here come the tractors saying, the heck with you, mister. I'm the federal government's gas company, and I'm here. Will the final resolution resolve your entry onto the property and all these other issues that are so annoying to the landowners? Absolutely, because they'll get paid for detecting whether it happened at the beginning of this year. Are you all going to keep coming on the land? I guess you will to service your pipeline. That's right. Particularly once we get title to the easement, which is what is granted at the end of the proceeding, then we will have an easement, and that will provide us rights of access that an easement provides. It just so happens it's obtained through condemnation. And so as necessary to come to service, repair, replace, to make the pipeline function, we will have easement rights to access the property, and they'll get compensated for it in the proceeding. Just like in any condemnation action, they have the right to compensation, and they will get that compensation. Some of the folks you've settled with already, have they already been paid, or everybody's waiting on the compensation here? We're waiting because since we have a consolidated action where these cases are all affected by the pipeline and need to move forward, we are having a status conference in October to address a collective procedure for moving toward a uniform and consistent process for getting all of the landowners paid. So none of them have been paid yet? They have not. They have not. We've posted the bond, the surety bond, to ensure that they will get paid, but we have to go through some discovery and other matters and then have either a determination by a commission or a trial proceeding ultimately. Which gets back, I guess, to what the plaintiffs, I call them the plaintiffs, they're called the defendants, but the landowners, their original concern was, and the deed may be done and the gas is flowing, but their original concern was, why so quickly? I mean, why did an injunction have to be granted? What was wrong with the pipeline company like any other person? You want to take somebody's land? You go through the process and you go through the compensation hearing, and their argument is there really was no reason for the judge to grant this injunction. You could have gone through a normal process, and since this could repeat itself in the future, depending on how we write the opinion, could you please answer to me why there was such a rush? I understand you had a certificate, but they said you made up the deadline. You could have made up a new deadline. So could you explain to me what the emergency was? Absolutely. First, I do want to note they have not raised this issue in the appeal. I will address it, but they have not appealed the general application of a Rule 65 preliminary injunction in the way that it occurred, in the way that courts across the country have done it. They have not raised that issue. With respect to the sense of urgency, they're numerous. First of all, FERC and the certificate gave us two years from the certification to have the pipeline in service. I thought, though, from the briefing that you told FERC that's the deadline we want, and FERC, like a government agency, says, okay, that's fine with us. If they didn't impose that on you, you suggested that deadline. That is not my understanding, Your Honor. My understanding, I remember talking with Judge Ross about this in the trial court, is that that's the application of a more general regulation that FERC has. They set a time frame, and I think it's two years. My understanding is that is not something that we offered or requested. My understanding is that, instead, it was set by either existing regulation that's applied as a matter of course or that FERC applied it particularly to this project. So we had that two-year time frame. We also had contracts with Oglethorpe Power and AGL, which had an in-service date of May 1, 2017. And we have 115 miles of pipeline to build to get this into service. It's a significant undertaking with contractors who we have contracts with, and it's a linear process for building a pipeline. If you had told those contractors, Georgia Power, you know, it's a lot of landowners. I don't know how courts are. I don't know if we can get this done in two years. We need three years. There's some sense they might have gone elsewhere and not. I don't have that sense. The date, the May 1, 2017 date, was set based on when they needed the additional resource, the additional infrastructure for the resource. And so that's when the date that was set in the contract, and that's the date that we had to proceed toward. And the process of building a pipeline is obviously a linear process where you've got different phases and trades that have to work in sequence, and that if you hit a property that you don't have access to, everything has to stop. And you run into work stoppages, which cost hundreds of thousands of dollars a day, as Mr. Mathis testified in his affidavit to, as well as if you have a workaround, per workaround. We're talking hundreds of thousands of dollars per workaround because the equipment has to be moved around the property and then proceed as it can on the properties we do have access to. So not having complete access, linear access, to the pipeline to build this in sequence would cost us significant amounts of money. And we're all doing this in an effort to meet these deadlines that were determined by need or by regulation. And we don't have an avenue to recover those expenses. We can't sue the landowners for those expenses. We can't sue anybody. There's no remedy at law, no access to money damages for us to remedy, to repair ourselves for those losses. And this is all in the context of the landowners having a process by which they are insured to be paid just an adequate compensation for this, enabling us to meet our deadlines, to avoid irreparable harm, to meet a public need as determined by FERC. I mean, FERC reviewed this for over a year. And there were even pre-application processes where we involved the public and made a determination that this pipeline was required by the public convenience and necessity. That is the standard. They made a determination that the public needed this resource. And so there's a process in place for them to get paid. We had to get going with the pipeline construction. We had to have full linear access to be able to construct the pipeline. And as a result, as numerous courts facing this issue have found, that a Rule 65 procedure for granting a preliminary injunction to give us access prior to getting titled, because that's what we would get at the end of the proceeding, we don't get titled until we pay them, is a proper remedy for us to avoid irreparable harm and meet our obligations. Now, it's important that if we don't get titled, then we do not have a permanent right to keep that pipeline on the property. Our ability to operate, construct the pipeline is beholden to Judge Ross's injunction order. If that were to be dissolved or if that were to not exist, then we would be trespassers. We have an incentive. We have to get to their compensation because we have to get titled to the easement rights in order to keep that pipeline on their properties into the future. And the applicable rule here in terms of what had to be done in connection with the preliminary injunction in terms of payment or bond is governed by Rule 65C, which requires the provision of security. And it's up to the discretion of the trial court as to even whether security has to be provided. It's certainly the type and the amount. And there's no application of Rule 71.1J1 because that, which is what requires a deposit, and which is the platform for all of their state law arguments that a deposit has to be paid first because that provision says that a deposit is required where it is required as a condition to taking and the law requires as a condition to taking. What that is referring to is the enabling legislation, the eminent domain authority that you're acting on. Does that require deposit? The Natural Gas Act does not require deposit. The Declaration of Takings Act, which I think is 28 U.S.C. 3114, does require deposit. If you were the federal government acting on that authority, you would have to make a deposit. But the Natural Gas Act does not require deposit. It requires you to follow state proceedings as the state Georgia Constitution requires, but then we run face into the rules, Rule 71. Well, it doesn't require, the Natural Gas Act does not require us to follow the state laws and procedures. In Southern Natural Gas, this court determined that that part of 717FH no longer applies. It did apply literally, but our court read over that requirement. Right, because subsequent to that language, 717FH, the 71.1A, which is now 71.1, was enacted providing a uniform procedure in 1951 for condemnation actions in federal court. Prior to that, what was happening is Congress was enacting individualized acts to say, all right, we want a national park. We are enacting a law that says you can go condemn the property in need for that national park. Whatever it might be, an army base, whatever, a fort. Individualized legislation which provided their own procedures, or they would say follow the state procedures because there wasn't a uniform procedure in place. That all changed in 1951 when 71.1 or 71A was operative, was approved, and became law. And so no longer does that section of subpart H have any application in Southern Gas says that. What about the Georgia Power versus Sanders decision? Well, first of all, we did take the position that they didn't raise that in their opening brief, and so our position is they waived it. But also, that case dealt with the narrow issue, and they said this explicitly, the narrow issue of the method of determining the measure of compensation. And it was very explicit that that was the narrow issue in front of it because the measure of compensation doesn't impact the federal government's eminent domain power, the exercise of it.  And the law, according to the Supreme Court, in the Coal versus United States, it's 91 U.S. 367. This case, which appears to be one of the first cases, if not the first case, looking at the federal government's authority to enact its own legislation to condemn properties as opposed to resorting to the state laws, and this is a 1875 decision, made it clear the distinction between the two sovereignties and that state law cannot diminish the United States' exercise of eminent domain. This is a quote from the case on page 374. If the United States has power, it must be complete in itself. It can neither be enlarged nor diminished by a state, nor can any state prescribe the manner in which it must be exercised. The consent of a state can never be a condition precedent to its enjoyment. And the whole case talks about the ability of a state or the United States and its exercise of eminent domain being beholden to the state laws and whether it has to apply to state laws in order to affect its exercise of eminent domain. And it doesn't. The Fifth Amendment of the United States Constitution applies, and the Fifth Amendment does not require any payment before the taking. The Presialt case, which we cited, and the Williams County case, which we cited in our briefs, make that explicitly clear. All that has to be provided is a procedure that makes certain that they are going to get paid. And that is what they have. We are trying to get there. Back to where we started again. So the gas is running. They are asking the pipes to be pulled out. I'm sure your argument is we don't stop the gas from running now until they get paid. But they want to be paid, and they're concerned that federal proceedings can take forever and a day. And so your argument is that the court is moving expeditiously. And I guess any opinion we wrote could also direct an expedited handling of this matter. Is that correct? That's true. That's absolutely true. And I note before they filed their appeal in Judge Ross's order, she said we're going to set a schedule to get going on compensation. And then the appeal occurred. The quickest way to get them compensated is to affirm, have us get back to the trial court, and proceed toward the adjudication of their compensation. That's the quickest way to get them paid. Nobody has settled with you on an amount yet, though. Everybody's got to go to a hearing. None of the property owners. You haven't written a check to anybody. We've written a check to a lot of property owners. We have acquired. So you have compensated some people. Not the appellants. No, not these people, but some of the owners. Over 93% of the rights-of-way that we needed for this, we acquired through voluntary negotiations with landowners. Those people who are not involved in the appeal are not stayed or waiting for this appeal. It's just those who appealed who haven't gone forward. Absolutely. That's exactly correct. Yes. Thank you. If I could respond to a couple of points raised. Council stated that the appellants are insured to be paid. We are insured to be paid for the rights taken, for the value of the land taken, and severance damages to the land that remains under the NGA. But that does nothing to compensate the taking that we're suffering at the moment. The taking which precedes the transfer of title under the NGA is the one that we're experiencing now. And courts throughout the country have treated that time period and how it's compensated differently. Some courts, which have required prepayment, allow the prepayment to be the compensation for the advance date of the rights. Other courts have not. Some courts allow interest on the amount that was not paid and should have been once compensation is finally determined. If there was initial deposit and it turns out that the landowner was entitled to additional compensation, they'll allow interest back to the date that the— So in your compensation hearing, you will be seeking all those things, right? We'll be seeking compensation for the taking, but there is no procedure under federal law. It's not part of—this pre-judgment taking is not compensated as part of an NGA hearing. How have those courts that have given compensation for the pre-taking, what's been their vehicle to give that compensation then? Well, they'll say that, well, we note that the Power Pipeline Company has been in possession of the properties since way before today, and we are going to allow interest on the award back to that date as if it had been paid originally. They didn't do it under the NGA, but they just did it under some inherent common-sense authority. That's correct. There is no procedure. Won't Judge Ross have that same common-sense authority later on to give you the same thing? But it's different in every court. There is no reasonable, certain, and adequate provision for that payment, which is required under the Fifth Amendment. Well, if she gives you less money than you think you deserve, can't you appeal that? Certainly, again. One court has allowed—think about it. If you allow interest to compensate for the pre-judgment taking, that bears no relation to the actual harm caused to the landowner or the land itself. We've got clients who have suffered having a 15-foot trench all the way across their property and no way to get to the 100 acres on the other side of that trench, and it was like that all summer. There's no provision under the NGA for special damages like that to be compensated, and without such a procedure, it violates the Fifth Amendment. Back to my first question again, to emphasize it again. The pipe's there. The gas is flowing. You're not asking me to tear the pipe out. You're not asking me to have them turn the gas off. So all we really are at is a compensation here. We are asking that the gas be turned off. Not that the pipe be dug up, no. It's a permanent infrastructure. We recognize that. But they shouldn't be allowed to use our property until they have paid for it. So, yes, we would ask that the gas be cut off until they have acquired validly rights to our property. A couple of other points. Irreparable injury. Council had a hard time answering those questions. The record does not contain the answer to those questions because we didn't have a hearing. Laying aside all of the legal issues about this procedure to this point, it is absolutely unfair for such far-reaching rights to have been taken from our clients without them having an opportunity to testify, to cross-examine witnesses, to put up evidence. You can't expect a landowner to be able to show that his harm by granting the injunction is going to outweigh TRANSCO's alleged harm with their in-service date, which, by the way, they missed. It was May. Everything was going to fall apart in May, but it didn't happen. If the landowner is not allowed to speak, how could they possibly make out? I'll ask you all last to have some of the landowners testify in the district court who refused to allow that. We refused to allow it. We subpoenaed witnesses. And she refused to take evidence, only legal argument. That was unfair. How would the amount of any prepayment be determined? Wouldn't you have to have a proceeding to do that? Proceeding? Well, yes, Your Honor. You would have to approximate the value of the property and pay that in as a deposit. That's what would be done if Congress had given TRANSCO or pipeline companies the power to use a declaration of taking method. But they didn't. And so what we're dealing with instead is a judicially created remedy, special for pipeline companies under the NGA, and nobody knows how to compensate it. Nobody knows what it is. As I said before, it's not a property right that exists under Georgia law, so it's not easy to figure out. You'll find in the record an affidavit from Gary Burns where he says that the Aheal Pines, a master appraiser well-known throughout the state, the rights that TRANSCO seeks in this action, and certainly the rights that they've acquired through Judge Ross's order, compensation can't be calculated. There's no way to value them that he is aware of, and he's a professional appraiser. You don't want to go too far with that because in a couple months you're going to be valuing them pretty high, aren't you? Your Honor, we're talking to the right audience for exactly that argument. I'm going to let you withdraw that observation. Last point. State law requires prepayment. There's nothing that is inconsistent with the state law requirement under our Constitution, Georgia, in federal law. The NGA doesn't have a procedure for a deposit because they don't allow possession before title transfers. In order for federal law to completely displace... I was almost up, so I'll let you wrap up. Thank you, Your Honor. In order to completely displace state law, there has to be an inconsistency. And yes, the Georgia Power v. Sanders case is relevant to property rights in Georgia, certainly in the compensation area, as well as in retaining continuing vitality. As recently as June of this year, in the Middle District of Florida, in the Sable Trail cases, Judge Walker issued an opinion that relied heavily on Georgia Power v. Sanders for its analysis. So I would commend that. This is in our addendum material. Thank you, Your Honor. Thank you. We'll be in recess.